UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RANDY PAUL CLAUSE                                    CIVIL ACTION

VERSUS                                                NO. 07-4169

MICHAEL J. ASTRUE, COMMISSIONER                       SECTION "C" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Randy Paul Clause, seeks judicial review pursuant to Section 405(g) of

the Social Security Act (the "Act") of the final decision of the Commissioner of the

Social Security Administration (the "Commissioner"), denying plaintiff's claim for

disability insurance benefits ("DIB") and supplemental security income benefits ("SSI")

under Titles II and XVI, respectively, of the Act. 42 U.S.C. §§ 405(g), 423, 1381a. This

matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)

and Local Rule 73.2E(B).

The court entered a scheduling order in this case on August 24, 2007. Record

Doc. No. 5. Plaintiff was ordered to show cause on March 14, 2008 why he had not

complied with the scheduling order by filing a brief in support of his claims. Record

Doc. No. 8. He obtained an extension of time to file his brief until April 2, 2008. Record

Doc. No. 12. Despite having been ordered to file a brief in support of his claims for

relief, Clause filed a motion for summary judgment. Record Doc. No. 15. The

magistrate judge assigned to the case at that time denied the motion and again ordered plaintiff to file a brief.  Record Doc. No. 18.  On May 20, 2008, plaintiff filed a timely Brief in Support of Claim for Social Security Disability Benefits.  Record Doc. No. 19. Defendant filed a timely reply memorandum on July 7, 2008.  Record Doc. No. 20.  The case was reallotted to me on October 31, 2008.  Record Doc. No. 22.

I.    PROCEDURAL HISTORY

Clause protectively filed applications for DIB and SSI on October 6, 2004, alleging disability since November 15, 2003 due to a herniated disc and hypertension. (Tr. 50-52, 85, 88, 170-72).  His applications were denied initially and, on February 2, 2005, he requested a hearing.  A hearing was held before an Administrative Law Judge ("ALJ") on June 20, 2006.[1]  (Tr. 176-206).  On August 23, 2006, the ALJ issued a decision denying plaintiff's applications. (Tr. 15-22).  After the Appeals Council denied review on June 21, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 4-6).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

---

[1]The ALJ noted that the hearing had been delayed by Hurricane Katrina, which struck the New Orleans area on August 29, 2005, and that the ALJ himself had been brought in from San Antonio to hear the case because the New Orleans area hearing office had been closed for so long.  (Tr. 188).

A.    The ALJ erred by failing to re-contact plaintiff's treating physician, despite finding a conflict in the evidence obtained from the physician.

B.    The ALJ erred by failing to give controlling weight to the opinion of plaintiff's treating physician.

III.    <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

1.    Plaintiff has severe impairments of lumbar disc pathology, hypertension and obesity, which do not meet or equal any listed impairments found at 20 CFR, Part 404, Subpart P, Appendix 1. He does not have a medically determinable, severe knee impairment.

2.    Clause has the residual functional capacity to perform light work with the ability to lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for up to 90 minutes at a time for a total of 6 hours in an 8-hour day; and stand for up to 90 minutes at a time for a total of 4 to 6 hours in an 8-hour day; with the following limitations: no frequent kneeling, crawling, squatting or overhead reaching; no work at heights or on ladders; no heavy industrial driving; no work around dangerous machinery; and no exposure to industrial vibration.

3.    Although plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, his testimony concerning the intensity, persistence and limiting effects of his symptoms was not entirely credible.

4.    He cannot perform any of his past relevant work as a farm tractor driver or an air conditioning technician.

5.    Considering his age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that Clause can perform, including cashier, security guard and hand packer.

(Tr. 17-22).

IV.    ANALYSIS

   A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Perez, 415 F.3d at 461. Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[2] plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2006). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920;

---

[2]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994); Hollis v. Bowen, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[3]  The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Perez, 415 F.3d at 461.

   The claimant has the burden of proof under the first four parts of the inquiry.  If

he successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

capable of engaging in alternative employment, the burden of proof shifts back to the

claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

---

[3]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (2007) ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

B.     Factual Background

Clause testified that he was born in 1965, completed the ninth grade and received vocational training as an air conditioning technician. (Tr. 180-81). He stated that he last worked around the beginning of 2003 as a self-employed air conditioning technician. (Tr. 180). He said he stopped working around that time after he lifted a riding lawnmower into the back of a truck and then experienced bad lower back pain that caused him to see a doctor about two days later. (Tr. 181-82).

Plaintiff testified that he was not having any other pain at that time, but he later began having pain in his right knee. He said that he had undergone surgery on the right knee about eight years before the hearing. He said that he now favors his right knee and tries to use his left knee more. He stated that, since the incident with the lawnmower, he also began having pain in his left arm or hand and his left leg. He testified that he has constant lower back pain that prevents him from sitting or standing for more than 15 to 30 minutes. (Tr. 182-83). He said that he relieves the pain from sitting, either by

standing and walking around for a few minutes, lying down or using Icy Hot or Bengay cream, while he relieves the pain from standing by sitting or lying down.

Clause stated that, on a typical day, he wakes up, takes a shower, watches television, walks around, watches more television and lies in bed for about six hours during the day. (Tr. 183). He said that he lives with his youngest daughter, who is 16 years old, and that he does no work around the house. He testified that his two older daughters live nearby and they do the cooking, cleaning and grocery shopping for him. (Tr. 184-85). He stated that sometimes he goes to the grocery store, but he rides with his daughters because he does not drive. He said he used to drive a truck with a standard transmission, but he stopped driving when he could no longer use his left leg. He stated that he probably could drive a car with an automatic transmission, but he has never tried it and has not driven at all in the past three years. (Tr. 185).

Plaintiff testified that he remembers when his treating physician, Dr. Francis Robichaux, filled out a residual functional capacity questionnaire dated only December 18th, and that he believes his doctor filled it out in December 2005. (Tr. 185-86). He said he cannot walk more than 50 yards without pain or shortness of breath. He said that he walks around the house, but cannot do so for more than 15 to 20 minutes.

Clause stated that he takes Lortab[4] for pain and that it sometimes makes him dizzy, while three other medications he takes make him feel nauseous every day. (Tr. 186). He said he told Dr. Robichaux about these side effects and that Dr. Robichaux changed his medications a couple of times. He testified that Dr. Robichaux is a family physician. He stated that he last saw an orthopedist, Dr. Thomas Donner, in 2004 or 2005. When the ALJ pointed out that the record contains a note from Dr. Donner dated 2003, plaintiff said that he was not sure, but that might have been the last time he saw Dr. Donner. (Tr. 187).

When asked during the medical expert's testimony whether he had ever had an electromyography,[5] Clause said he thought that he had. He testified that he had undergone a spinal tap, which did not heal properly, and that he had returned to the hospital about one week later for treatment of the wound. (Tr. 191). He stated that Dr. Donner performed the spinal tap in 1999 or 2000. When the ALJ pointed out that there

───────────────

[4]Dr. Robichaux prescribed Lortab 7.5, which contains 7.5 milligrams of hydrocodone and 500 milligrams of acetaminophen. It is indicated for the relief of moderate to moderately severe pain. Hydrocodone is a semisynthetic narcotic analgesic and antitussive with multiple actions qualitatively similar to those of codeine. Acetaminophen is a non-narcotic pain reliever. The most frequently reported adverse reactions to Lortab are light-headedness, dizziness, sedation, nausea and vomiting. RxList, avail. at http://www.rxlist.com/lortab-75-drug.htm.

[5]Electromyography (which is referred to in the testimony as an EMG) is an electrodiagnostic technique for recording the activity of skeletal muscles. Dorland's Illustrated Medical Dictionary 576-77 (29th ed. 2000) (hereinafter "Dorland's").

was no evidence of a spinal tap in the records, but that there had been an MRI[6] of his back in 1997, Clause agreed that Dr. Donner had performed an MRI after he injured his back while lifting firewood in 1997. He said he was told at that time that he had a herniated disc. (Tr. 192-93).

C.     Medical Expert Testimony

An orthopedic surgeon, George Weilepp, testified by telephone as a medical expert. (Tr. 179, 189). Parts of his testimony are confusing and difficult to follow. Because of that difficulty, I have quoted some parts of his testimony directly, rather than trying to summarize it.

Dr. Weilepp testified that he is a certified orthopedic surgeon and has been licensed since 1965. He stated that he had retired from practicing surgery in 1991, has been doing consulting work since then and maintains his license in California. He said he had reviewed the medical exhibits. (Tr. 189).

Dr. Weilepp testified that Clause has back disease, hypertension and obesity. He stated that plaintiff's back disease is the most significant in terms of his functionality, and

_____

[6]Magnetic resonance imaging (which is referred to in the testimony as MRI) is "a noninvasive diagnostic technique that produces computerized images of internal body tissues and is based on nuclear magnetic resonance of atoms within the body induced by the application of radio waves." Medline Plus Medical Dictionary, avail. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=magnetic+resonance+imaging.

that his obesity contributes significantly.  He said that plaintiff's hypertension is under

marginal improvement, that his blood pressure medications are marginally effective and

that he has no secondary cardiovascular effects from his hypertension.  He stated that

Clause's knee problems are historically, but not currently, well defined.  He testified that

Clause had a recurrence of knee symptoms around November 2003, related to some

lifting he had done, but that the records do not contain any details.  He said the objective

evidence was insufficient for him to evaluate plaintiff's knee separately or in

combination with his other impairments.

Dr. Weilepp testified that Clause does not meet Listing 1.04A or C.[7]  However,

he stated that "[t]here are some issues regarding equaling the listing in terms of presence

of back disease at two levels."  (Tr. 190).  He said the problem arises because he thinks

that the doctor's progress notes for February 12, 2003 in Exhibit 2F-6 [(Tr. 118)][8] state

that plaintiff had a negative EMG test but, because the progress notes are partially

---

[7]Listing 1.04 establishes disability at the third step of the sequential evaluation for disorders of
the spine "resulting in compromise of a nerve root," provided that one of the subparts is satisfied.
Subpart A requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution
of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if
there is involvement of the lower back, positive straight-leg raising test."  Subpart C requires "[l]umbar
spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically
acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to
ambulate effectively . . . ." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.

[8]Exhibit 2F consists of six pages of progress notes from an apparently unknown source.
However, the same pages are duplicated in Exhibit 5F, which consists of records from the Family Doctor
Clinic, where plaintiff was treated by Dr. Robichaux.

illegible, Dr. Weilepp was not sure whether Clause ever had an EMG and, if he did, what the results were.[9] (Tr. 190-91). Dr. Weilepp noted that there are no records of physical therapy or other follow-up to plaintiff's visit to an orthopedist, Dr. Thomas Donner, in April 2003, or even before that, regarding plaintiff's back disease. Dr. Weilepp testified that he was "somewhat in a quandary as to an equaling level without neurological as defined other than some subjective issues poorly defined in the records has put me in kind of a hard place to come up with a specific answer, except that back disease does occur in this individual who has some poorly controlled obesity and marginal other problems like hypertension and knee problems."

Dr. Weilepp testified that the records do not reflect that plaintiff ever had a spinal tap. (Tr. 191). He stated that there is no record of any neurological abnormalities. He explained that the treating physician's statement in Exhibit 4F [(Tr. 127)] that the exam was non-focal means that there are no neurological abnormalities. (Tr. 193).

The ALJ asked whether Dr. Robichaux's functional assessment [(Tr. 127-30)] was consistent with the medical records. Dr. Weilepp responded that "it's different than the one I would give at a similar time frame December of '05, early of '06, and it differs because of the, it looks like the restrictions are primarily due to pain and not to physical

_____

[9]My own review of the medical record reveals no evidence that plaintiff ever had an EMG.

limitations or neurological limitations."  (Tr. 193-94).  He noted that Clause was currently taking only Lortab for pain, although he could not find in the record when that drug was started.  He stated that Clause was not taking Lortab in April 2003, but was then taking Celebrex and Voltaren, which are anti-inflammatory medications.  He continued by stating, "I would say that [Dr. Robichaux's assessment is] more restricted than I would suggest or allow a patient in my office, or in giving my opinion I would allow the patient may be[10] restricted light."

Still apparently answering the ALJ's question about Dr. Robichaux's functional assessment, Dr. Weilepp testified that Clause has

> other issues that are quite restricted in terms of heights, ladders and frequency and vibration, dah, dah, dah.  I mean just no driving and continuous bending from the waist to the floor but frequent and occasional not precluded at the light level of 10/20,[11] and with a sit/stand, so that's where I was before the hearing started and I've improved that cornering the EMG of [Exhibit] 2F page six [(Tr. 118], March of '03,[12] and the prior existing MRI that was done several years before this onset in terms of duration of back disease.  And using the I'm assuming it's an orthopedist's evaluation of April of '03 [Dr. Donner, Exhibit 1F (Tr. 111-12)] which is consistent with that, with the sub-subjective findings and marginally presented from that orthopedist or that orthopedic evaluation.  With no, essentially no change in the MRI according to Thomas Donner on [Exhibit]

---

[10]This probably should have been transcribed as "maybe."

[11]This apparently refers to light work, which by definition includes lifting no more than 20 pounds at a time with frequent lifting or carrying of up to 10 pounds.  20 C.F.R. § 404.1567(a).

[12]The progress notes on this page are dated February 12 and 19, 2003, not March.

1F2, which had re-bulging on the left and a disc protrusion non-herniation with [radicular] symptoms on one leg, and secondary to disc herniation which he puts under [impression] which is not unusual in terms of how one in his position would characterize the back disease without the surgical capability and without commenting on the report regarding the neurological issues. And then the family physician [Dr. Robichaux (Tr. 127)] comes up with gen (phonetic) non-focal, which is certainly an interesting commentary, and then under restricted capability even at sedentary, which I would not predict for this particular individual even [though] he's had long-term back symptoms.

(Tr. 194-95).

Dr. Weilepp opined that plaintiff has the residual functional capacity for restricted light duty with the ability to lift 10 pounds frequently and 20 pounds occasionally; to sit 6 hours or more for cumulatively 240 minutes with the capability to "sit/stand" for 90 minutes for comfort and pain relief; to stand and walk for cumulatively 4 to 6 hours 90 minutes at a time; with no work at heights or on ladders because of his knee problem, blood pressure and back disease; no frequent kneeling, crawling, squatting or overhead work because of his two-level disc disease; no heavy industrial driving, heavy industrial vibration or work with dangerous equipment because of his leg problems; and no continuous bending from the waist to the floor "at light with the light restrictions, but frequent and occasional not precluded." (Tr. 195).

Upon cross-examination by plaintiff's attorney, Dr. Weilepp compared the results of lumbar spine MRI tests performed in April 2003, Exhibit 5F-18 [(Tr. 148)], and

February 2005, Exhibit 5F-4 [(Tr. 134-35)].  He agreed with the statement of plaintiff's attorney that there are "significantly more findings" on the 2005 MRI, but noted that they were interpreted by two different doctors.  (Tr. 196).  The medical expert stated that both reports "have issues of some displacement of the vertebra root not contacting the sacral side[,] which can generate symptoms of pain and can generate weakness, but not defined by this particular issue at least on the record."  He testified that the 2005 finding of a hemangioma[13] is an ancillary finding and that the finding of a minimal two millimeter retrolisthesis[14] is not unlikely with degenerative back disease with longstanding spondylosis.[15]  He noted that the 2005 test showed a diffuse disc bulge at L4-5 with no evidence of central canal stenosis[16] or neural foraminal[17] narrowing.  Dr. Weilepp observed that, on the 2005 examination, the spinal canal at L5-S1 "is significantly

---

[13]Hemangioma is either "an extremely common benign tumor, occurring most commonly in infancy and childhood, made up of newly formed blood vessels," or "a general term denoting a benign or malignant vascular tumor that resembles the classic type of hemangioma but occurs at any age." Dorlands at 795.

[14]Retrolisthesis is a form of spondylolisthesis, with "retro" meaning backward or behind. Spondylolisthesis is the displacement of one vertebra over another.  Id. at 1568, 1684.

[15]Spondylosis means either ankylosis (immobility and consolidation) of a vertebral joint, or is a general term for degenerative spinal changes due to osteoarthritis.  Id. at 91, 1684.

[16]Stenosis is an abnormal narrowing of a duct or canal.  Id. at 1698.

[17]A foramen is a natural opening or passage, especially into or through a bone.  Id. at 696.

narrow[ed] mostly by the epidural lipomatosis[18] which is either congenital or developmental and has no particular bearing on the status of the degenerative issue without neurological compromise." He stated that "there may have been a change from April of '03 to February of '05 in terms of [retrolisthesis] being more significant," because there was no mention of it at the L5-S1 level in 2003. (Tr. 197).

When plaintiff's attorney asked him to explain epidural lipomatosis, Dr. Weilepp testified that it might be congenital, developmental or post spondylosis, but that the neuroradiologist's report does not comment on either its origin or significance. He said that, as an orthopedist, the most he could say is that "unless it's of significance neurologically[,] it's considered as a variation secondary to degenerative back disease and not impacting on functionality specifically." He noted that some soft tissue degenerative changes, like this finding, can impact on the spinal canal in some people, "but without some commentary objectively from the examiners on the actual films I'm a little somewhat unable to give you a more specific commentary about that finding, but it's definitely does not significantly alter the pathology of the degenerative disc disease at both those levels." (Tr. 198).

---

[18]Lipomatosis is "a condition characterized by abnormal localized, or tumor-like, accumulations of fat in the tissues." Id. at 1016. Epidural means located upon or outside the dura mater, id. at 607, and the dura mater is "the outermost, toughest, and most fibrous of the three membranes" that cover the spinal cord. Id. at 550.

Dr. Weilepp testified that the findings in these two MRI reports could explain the degree of pain about which Clause testified. He stated that the findings are "all explicit in regard to can be productive of some discomfort, of some back disease ongoing and has been for probably more than a decade." (Tr. 199). He said that plaintiff is obese because he is 5'11" tall and weighed 230 pounds on February 7, 2006, according to Dr. Robichaux's office notes, with evidence that he weighed more at times. (Tr. 199-200). Dr. Weilepp opined that plaintiff's obesity is "not a major issue but it's a contributing issue" to both his hypertension and his back disease. He explained that people with as little as ten percent increased weight "have more trouble with two-level disc disease with pain and with a relatively long history. . . . I believe that it's highly representative of the fact that Lortab is being used which is a narcotic with or without Voltaren or Celebrex consistent with a level of pain that's not marginal but significant, and it impacts by those drugs as somewhat improvement were he not to take the medicines." (Tr. 200).

D.    Vocational Expert Testimony

A vocational expert, Deborah Bailey, testified at the hearing. She stated that plaintiff's past relevant job as an air conditioning technician is classified by the Dictionary of Occupational Titles as medium, skilled work, but that the record in this case indicates that Clause lifted and handled more weight, so that the job as he performed

it was at the heavy level. (Tr. 201-02). She said that his prior work as a tractor driver in the sugar cane industry was sedentary and semi-skilled.

The ALJ posed a hypothetical of a younger individual under age 45 with a limited education and plaintiff's prior work experience, who can lift up to 10 pounds frequently and 20 pounds occasionally; can sit up to 90 minutes at a time and 6 hours in an 8-hour work day; and can stand and/or walk for 90 minutes at a time, up to 4 to 6 hours total. The person should avoid heights and ladders; could perform other postural functions occasionally, except that he could bend from the floor frequently; can do overhead work occasionally; cannot do any heavy industrial driving; and cannot be exposed to heavy industrial vibration. (Tr. 202-03). The vocational expert testified that such an individual could not perform plaintiff's past relevant work as an air conditioning technician or tractor driver. She stated that the person could perform light, unskilled work as a cashier, security guard and hand packer, and that all of these jobs exist in significant numbers in the Louisiana and United States economies. (Tr. 203).

Bailey testified that if the individual had to alternate sitting and standing at 30-minute intervals instead of 90-minute intervals he could still work as a security guard, but that fewer numbers of such jobs would be available. (Tr. 203-04). She stated that the person would not be able to work at any job if he had to lie down for up to six hours in a day. (Tr. 204).

Plaintiff's attorney posed a hypothetical of an individual with Clause's age, work experience and education who could sit continuously for no more than 15 minutes, could stand continuously for no more than 15 minutes, could sit and stand less than 2 hours in an 8-hour work day, needs to walk around every 15 minutes for 15 minutes, needs to take unscheduled breaks 4 to 5 times per day for 20 minutes at a time, and can lift less than 10 pounds frequently and 10 pounds occasionally. Bailey testified that such an individual would not be able to work at any job. (Tr. 204-05).

E.     Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 19-20). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

F.     Plaintiff's Appeal

1.     The ALJ did not err by failing to re-contact plaintiff's treating physician.

Plaintiff argues that the ALJ erred by failing to re-contact his treating physician, Francis Robichaux, M.D., despite finding a conflict in the evidence obtained from that physician. The ALJ gave "no significant weight" to Dr. Robichaux's residual functional capacity assessment because "it is undated, inconsistent with the finding of no

19

neurological abnormalities, inconsistent with Dr. Weilepp's opinions, and it appears to be based solely on claimant's subjective complaints of pain." (Tr. 20). Clause contends that these conclusions required the ALJ to seek "additional evidence or clarification from" Dr. Robichaux because "the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). However, those sections do not apply if, as in this case, the record contains sufficient evidence for the ALJ to make an informed decision. See id. § 404.1527(c)(2) ("If any of the evidence in your case record [for DIB], including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have."); id. 404.1527(c)(3) ("we will try to obtain additional evidence under the provisions of §§ 404.1512" only if "we do not have sufficient evidence to decide whether you are disabled"); id. § 416.927(c)(2), (3) (same as to SSI).

Clause argues that the ALJ ignored his testimony that he believes that the residual functional capacity questionnaire, which Dr. Robichaux dated only December 18th (Tr. 130), was filled out in December 2005. However, Dr. Robichaux treated plaintiff from 1978 through February 2006. Without some indicator of the year (and there is none

20

anywhere in the form), the ALJ was not required to accept Clause's uncorroborated belief that the form was completed in 2005.

Plaintiff also argues that the ALJ's finding of no neurological abnormalities is wrong because Dr. Donner specifically diagnosed him with radiculitis (Tr. 112), which is defined as "inflammation of the root of a spinal nerve."[19]  However, Dr. Weilepp testified that there is no record of any neurological abnormalities.  He cited Dr. Robichaux's statement that the exam was non-focal, which means that there are no neurological abnormalities.  The ALJ was not required to re-contact Dr. Robichaux to resolve the conflict.  To the extent that Dr. Donner's finding of radiculitis contradicts Dr. Weilepp's statements, the ALJ weighed the conflicting medical opinions and resolved the conflict in favor of Dr. Weilepp's opinion, as the ALJ is clearly entitled to do. Newton, 209 F.3d at 452; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Martinez, 64 F.3d at 176 (quotation omitted).

Accordingly, this assignment of error lacks merit.

---

[19]Dorlands at 1511.

2.   The ALJ did not err by failing to give controlling weight to the
opinion of plaintiff's treating physician.

Clause argues that the ALJ erred by failing to give controlling weight to the

opinions of his treating physician, Dr. Robichaux, which were expressed on the residual

functional capacity questionnaire dated December 18.   Plaintiff contends that Dr.

Robichaux's opinions were consistent with the entirety of the record, except for Dr.

Weilepp's opinions, and that the ALJ erred by rejecting his treating physician's opinions

and giving considerable weight to Dr. Weilepp's contrary opinions.

> The opinion of the treating physician who is familiar with the
> claimant's impairments, treatments and responses, should be accorded great
> weight in determining disability.   A treating physician's opinion on the
> nature and severity of a patient's impairment will be given controlling
> weight if it is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with other
> substantial evidence.   The opinion of a specialist generally is accorded
> greater weight than that of a non-specialist.
> Even though the opinion and diagnosis of a treating physician should
> be afforded considerable weight in determining disability, the ALJ has sole
> responsibility for determining a claimant's disability status.   The ALJ is
> free to reject the opinion of any physician when the evidence supports a
> contrary conclusion.   The treating physician's opinions are not conclusive.
> The opinions may be assigned little or no weight when good cause is
> shown.   Good cause may permit an ALJ to discount the weight of a treating
> physician relative to other experts where the treating physician's evidence
> is conclusory, is unsupported by medically acceptable clinical, laboratory,
> or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).

Even assuming that the residual functional capacity questionnaire was completed in December 2005, the ALJ could find that it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, was inconsistent with other substantial evidence and should be accorded lesser weight because Dr. Robichaux is a non-specialist, while Dr. Weilepp is a specialist. On the form, Dr. Robichaux stated that Clause suffers from chronic, persistent, daily low back pain that is worse with activity. When asked to identify any positive objective signs, Dr. Robichaux responded that plaintiff's range of motion was slightly limited and that his exam was non-focal. He stated that plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described. He said that Clause's pain was seldom severe enough to interfere with his attention and concentration. He stated that Lortab has a side effect of drowsiness. Dr. Robichaux opined that plaintiff's prognosis was fair. He estimated that Clause has the following functional limitations in an 8-hour work day: walk 2 blocks; sit or stand continuously for 15 minutes; sit, stand and/or walk for less than 2 hours; needs to walk around every 15 minutes for 15 minutes at a time; needs to shift positions at will from sitting, standing or walking; needs to take unscheduled rest breaks 4 to 5 times per day for 20 minutes at a time; can lift less than 10 pounds frequently, 10 pounds occasionally and never more than 10 pounds. He opined that Clause would likely be absent from work about three times per month. (Tr. 127-30).

As part of his argument that the ALJ erred by according no weight to these opinions from Dr. Robichaux, plaintiff argues that Dr. Weilepp's testimony was not deserving of significant weight because some of his answers were non-responsive to the questions asked. Although it is true that some of the answers were non-responsive, the court "must still determine whether this error was harmless. Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) (quotation and citations omitted).

Clause cites three non-responsive answers to questions: (1) whether plaintiff meets Listing 1.04, (2) whether Dr. Robichaux's functional assessment was consistent with the medical records and (3) what is epidural lipomatosis. However, none of the answers, when viewed in light of the entire record, created prejudicial error.

Plaintiff was represented by an attorney who had the opportunity to question Dr. Weilepp and to clarify any of his vague responses. Furthermore, Clause does not argue in this court that he meets Listing 1.04, so the medical expert's equivocal answer to the question about that listing was harmless error (if it was error) and not prejudicial.

As to whether Dr. Robichaux's functional assessment was consistent with the medical records, Dr. Weilepp responded that "it's different than the one I would give," then proceeded to explain his own assessment. As to the third question, although Dr.

Weilepp did not define epidural lipomatosis, he stated that it had no particular bearing on the status of plaintiff's degenerative back disease without neurological compromise.

The medical expert's failure to respond directly to these questions did not prejudice Clause. The ALJ explained that he gave Dr. Robichaux's assessment no significant weight because "it is undated, inconsistent with the finding of no neurological abnormalities, inconsistent with Dr. Weilepp's opinions, and it appears to be based solely on claimant's subjective complaints of pain." The first two elements of these findings were discussed in the preceding section. Substantial evidence supports the ALJ's other two findings.

Dr. Weilepp's opinion, which contradicted Dr. Robichaux's, was stated at length and was based on his review of the medical records, including Dr. Robichaux's treatment notes, Dr. Donner's report and the MRI findings from 2003 and 2005. Clause saw Dr. Donner on April 10, 2003 for complaints of back and left leg pain. Dr. Donner found no neurological, motor or sensory abnormalities. Plaintiff had a positive straight leg raising test bilaterally with left radicular pain and had some bilateral paraspinal tenderness. Dr. Donner compared the MRI results from his previous treatment of Clause in 1998 with the April 2, 2003 MRI results. He found no change in plaintiff's pathology at L4-5, for which the MRI "showed an eccentric bulging to the left," but plaintiff now had a large left disc protrusion at L5-S1. Dr. Donner's impression was lumbar radiculitis secondary

to L5-S1 disc herniation. However, Dr. Weilepp disagreed that the MRI finding of "disc protrusion" was a herniation, and he stated several times that there was no neurological compromise or abnormality. (Tr. 195).

Dr. Donner recommended that plaintiff undergo physical therapy for a couple of weeks and that, if there was no improvement after that, surgery might be indicated. Clause was to return to see Dr. Donner in two weeks. (Tr. 111-12). There is no record that plaintiff ever received any physical therapy. Furthermore, he did not return to see Dr. Donner for almost two years.

Dr. Robichaux's notes state that plaintiff saw Dr. Donner on March 1, 2005 and that, as of April 19, 2005, Clause had opted for no surgery because his back pain was "bearable." (Tr. 142). On February 7, 2006, Dr. Robichaux noted that plaintiff's use of Lortab for lower back pain allowed him to function. (Tr. 137). Dr. Weilepp mentioned that Dr. Robichaux had treated plaintiff for a long time with pain medication only and that plaintiff's subjective complaints of pain were unsupported by any objective evidence of neurological abnormalities, specifically including the MRI results from 2003 and 2005, in support of his opinions concerning Clause's ability to function.

Although plaintiff does not make a separate assignment of error that the ALJ erred in assessing his credibility, he argues that the ALJ's reasons for finding him not entirely credible are not supported by the record. The ALJ found that the objective evidence

concerning (1) plaintiff's lack of neurological abnormalities, (2) his failure to seek recent treatment from an orthopedic specialist and his relatively mild medication regime, (3) his allegations of disabling hypertension despite the effectiveness of medication management, (4) his continued smoking and obesity, and (5) his sporadic work history, even before the alleged disability onset date, all undermined his credibility. Clause challenges the first, second and fifth findings.

The ALJ has the responsibility to evaluate the credibility of witnesses, <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002), and his evaluation is entitled to considerable deference by this court. <u>Bedford v. Astrue</u>, 236 Fed. Appx. 957, 2007 WL 1733132, at *4 (5th Cir. 2007) (citing <u>Newton</u>, 209 F.3d at 459; <u>Falco v. Shalala</u>, 27 F.3d 160, 164 & n.18 (5th Cir. 1994). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. <u>Id.</u> at 163-64; <u>Godbolt v. Apfel</u>, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); <u>accord</u> <u>James J. Flanagan Stevedores, Inc. v. Gallagher</u>, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing <u>Falco</u>, 27 F.3d at 164). The ALJ has done so in this case.

Plaintiff's lack of neurological abnormalities has already been discussed and is supported by substantial evidence. As to the second of the ALJ's disputed credibility findings, a claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may

be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 Fed. Appx. 689, 2005 WL 1463178, at *1 (5th Cir. June 21, 2005); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).  Clause did not undergo physical therapy when it was recommended and continued to seek treatment solely from a family physician, rather than an orthopedist.  When he did return to see Dr. Donner in early 2005, he opted not to have surgery.  He neither quit smoking nor lost any weight despite being regularly counseled by Dr. Robichaux to do both.

The ALJ also noted plaintiff's sporadic work history, even before the alleged onset date, which reflected earnings no higher than $10,000 per year, except in 1996.  The ALJ concluded that Clause's lack of high motivation to maintain competitive employment in the past suggested a similar lack of motivation in the present.  Plaintiff argues that he did not work much because of ongoing back pain, rather than because he lacked motivation.  The ALJ's finding concerning plaintiff's work history may not be the only reasonable conclusion to draw.  However, when combined with all of his reasons, his ultimate conclusion that plaintiff was not entirely credible is supported by substantial evidence and entitled to deference by this court.

Accordingly, this assignment of error lacks merit.

CONCLUSION

The ALJ did not err by failing to re-contact plaintiff's treating physician or by failing to give controlling weight to Dr. Robichaux's opinion. Substantial evidence supports the ALJ's findings.

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___3rd___ day of February, 2009.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE